May it please the Court, David Frederick from Lyle, Sawyer & Collins, on behalf of Black Thunder Powerboats, Inc. Unlike some of the matters the Court has heard this morning, this case concerns oral representations followed by a written contract for a personal luxury item. And I hope to be able, by the way, to reserve five minutes of my time for rebuttal. Black Thunder submits that there are three fundamental legal errors that were made by the district court below. The first one of which was to fail to honor the integration provisions of the contract, which include a specific provision that salesmen's verbal agreements and representations are not binding on the company. Now, the district court's rationale for not doing so was fraud, but as the Nevada Talman decision discusses at some length, if the fraud involved is simply the, quote, unquote, misrepresentations that are at variance with the contract, that fraud is not sufficient to vitiate the integration provisions of the agreement. Now, the second substantial error that was made by the district court was the failure to honor the provisions of the agreement that limit Black Thunder's liability to replacement or repair at its facility and expressly provide that its warranties are not applicable if someone else has worked on the boat. And this case provides a particularly cogent illustration of exactly the importance of those provisions for reasons I hope to be able to discuss with the Court. The third major and fundamental error made by the district court was its reliance on what it characterized as misrepresentations by omission. Now, the plaintiff, Mr. Daugherty, has admitted that he brought no such claim, and therefore, the question with respect to that issue simply wasn't before the district court. It wasn't in any way adequately addressed by the parties. And in addition to that, this is a Vendor-Vendee relationship, and the Monsanto case makes it pretty clear that under Nevada law, there simply is no duty to disclose in those circumstances. Now, let me return for the moment to the first issue, and that is, has to do with the integration provisions of this contract. Again, we have a particularly good illustration in the facts of this case as to why those provisions are important, and they're important, that they be respected by the courts. And that is, one of those representations ---- Counsel, I have a question for you, please. So were you urging previously that under the applicable state law, fraud in the inducement of a contract can't be considered in light of the integration clause? It would depend, sir, on what the fraud in the inducement is. If it is a circumstance here where the fraud is a representation that you will get something that is then subsequently excluded or disclaimed by the contract that you sign, then there is, I would submit, no real fraud in the inducement. What you have, again, is a conflict between oral representations and the contract that you've entered into. Tallman talks about fraud independent of the representations that are contradicted by the contract. And I think that it is that independent principle that would negate fraud in the inducement in your circumstances, sir. Now ---- Okay. So if the sales rep says you're going to get a boat that's like new. Right. Engine's going to be rebuilt. It's going to be the greatest boat since sliced bread or whatever. It's probably the wrong metaphor. But is this going to be wonderful? And then the written agreement doesn't say those things. And the integration clause in the written agreement under the State law, it would not let a court consider the representations of the sales rep. A very quick disclaimer, and then I will get to the substance of your question. I'm going to ignore for the moment the puffing question, which is fully addressed in the briefs. But putting that issue aside, the problem here is not simply the integration clause and the fact that those items are not addressed in the written contract. The problem here is also the fact that this contract expressly states you cannot rely and Black Thunder is not bound by a salesman's representations. So that the problem that you have in this particular circumstance is it's not simply something that is left out of the contract. There are cases that address that problem. The problem here is you have an express provision in the contract that prevents the buyer from relying on the kinds of statements that you postulated. Okay. Thank you, counsel. Now, I mentioned before, this is, again, a particularly apropos illustration. One of the representations here has to do with whether the engines would be fully rebuilt or refreshed. And there's significant testimony in the record to the effect that these are somewhat different, totally different, according to one witness. The problem is that the salesman to whom the representations the district court was binding Black Thunder, to him, he testified those two were one and the same. Now, I'm not saying this is a substantial evidence question in this case, but the point is this is why these provisions are in the contract. This is why the contract becomes not merely the integrated result or embodiment of the party's bargain, but also the document that makes it clear that a buyer cannot rely on these kinds of salesman's representations. Let me turn for a moment to the second item. And this is where, again, the facts of this case become particularly apropos as an illustration of the importance of the provision and the importance of courts giving effect to these kinds of provisions. Again, it's a combination of provisions. Number one, the liability is limited to replacement or repair at Black Thunder's facilities, and that the warranties are not applicable if someone else works on the boat. Well, here we have three individuals who work on the boat. Mr. Dunsmore, who in response to one particular problem, pulls the engines or at least authorizes that they be pulled and shipped to a Mr. Paff, who rebuilds the engines. The engines are then reinstalled, after which, according to Mr. Doherty, the boat ran absolutely great for an entire weekend on Lake Tahoe. And then we have Mr. Karnafel, who says, oh, no, the whole problem is the original rigging of the boat. And his charges for re-rigging the boat are more than half of the claim that is in dispute here. The problem is, of course, you have all of these various steps, and we know there's a problem with what Mr. Dunsmore did because the plaintiff admitted that in five minutes he created a problem that exploded the gaskets on the boat. We don't know what was done with Mr. Paff's rebuilding of the engines and reinstalling of those engines. There's no evidence from the plaintiff in the record as to what he did. So that by the time we get down to Mr. Karnafel, he says, oh, the problem is the original rigging, but Black Thunder has no way to deal with that kind of a contention, not in the courtroom, but in the real world. And that's why Black Thunder has in its contracts, if you want to hold us responsible, we are responsible for the work we do, and you have to have us do the work. Well, let me ask you a question about the rigging since you mentioned that. Is the district court's finding that the rigging was warranted necessary to its conclusion that Black Thunder breached the contract by failing to deliver a properly rigged boat? I'm not sure about that finding. It definitely is necessary to the award of damages. And the reason why I say that is because according to the only expert testimony we have from the plaintiffs, Mr. Karnafel, he says every substantive major problem with this boat's engines was a result of the original rigging error. So you have to get somehow, as a question of causation, and the causation issues are dealt with at length in the briefs. I don't intend, unless the Court has questions, to talk about those today. But on this particular item, unless you get to some kind of an obligation with respect to the rigging, whether it's a warranty, which is what the district court found, whether it falls under that provision for repair and replacement of defective materials and workmanship, which is a part of the warranty provisions of this contract, whatever, you do have to somehow get to a rigging responsibility on the part of Black Thunder because that's where the damage evidence comes from. Now, the problem that you have, as I say, I'm not setting up a substantial evidence question for this case. What I am setting up is the course of history with respect to this boat and its problems illustrates why, in the real world, companies like Black Thunder, who produce these kinds of luxury items, which one witness has characterized in the testimony as temperamental, has to be in a position of maintaining control of its own liability by, in essence, maintaining control over the work that is done on the boat for which it is supposedly being held responsible. Now, the third item I'll try to deal with relatively quickly, and that is that the district court, for some reason, and it is not exactly clear why it went in this direction, created a misrepresentation by omission set of findings. And those omissions had to do with expertise possessed by Black Thunder with respect to rigging boats with high-horsepower engines and with respect to the advisability of using larger drives in these particular engines, 6 or 7, what are referred to in the trade as number 6 or 7 drives as opposed to number 3A drives. Now, one thing to get out of the way, there's absolutely no evidence whatsoever anywhere in this record that the 3A drives, in this case, caused any of the problems with this particular boat. Nevertheless, the district court judge said, well, it is a misrepresentation that you didn't tell them that even though 3A drives work, they're not optimal, they're not advisable. The more substantive and the alleged misrepresentation by omission that is of much greater concern is this question with respect to the expertise of the rigging people in this particular case. The problem here is twofold. Number one, as the plaintiff admits, the claim wasn't planned. If there was a serious question about misrepresentation as to expertise and that kind of thing, we certainly could have addressed it. But the problem was by not pleading it, it simply wasn't in the case. It's a claim that wasn't brought. And therefore, it's not a proper basis of the judgment that's been rendered in this case. I'm pretty close to 5 minutes. If the Court has any further questions, I'll be happy to answer them. Otherwise, I'd like to re-observe. I have a question that doesn't go to the heart of the case, but it puzzles me. There was an award of $1 in punitive damages. Yes. That award has been appealed. I assume that could be a protective appeal. But let's assume that you lose everything but that issue. What's the impact of leaving that issue open? I mean, it's $1. Yes. Is there something else that follows? Is there a possibility of attorney's fees? Or what goes with that dollar? Quite frankly, I hadn't contemplated attorney's fees. What immediately leaps to mind is this is a very, I don't know the right word, narrow isn't quite it, but it is an industry with a very limited number of people participating in it. It is an extraordinarily important reputational and public confidence type of circumstance as to whether you have been found to have engaged in conduct warranting punitive damages. The punitive award here is based upon the misrepresentation notion. Well, but $1, I mean, obviously I have to believe that, you know, if you look to what, if you think someone's, if you find that punitive damages have been proven, I'm hoping that black vendors that I don't know what $1 would deter, you know, they have to be worth a little more than that. So it is a little puzzling. What does that mean? Well, the way the judge stated it on the record was he was making the finding of entitlement to punitive damages, but he, black vendors, a small company, said he didn't want to punish them too much. The only thing I can read into this is it is symbolic. $1 wouldn't stop you from anything. I mean, I can't buy a latte at Starbucks for $1. I agree with you. And he accompanied the award in his transcript when he was reciting his oral decision. The judge accompanied that award by a series of what's best characterized as instructions or directives to the client. I'm making this award because you should not do A, B, and C, et cetera. It sounded to me like it was a symbolic, nominal monetary award with not punishment as the result, but a directive to not engage in the conduct that would warrant punishment. All right. Do you want to save the balance of your time? Thank you. May it please the Court, Michael Merritt on behalf of Jerry Doherty. Since we're on the thing of $1, do you want to respond to that? Does it have any other meaning? It had the meaning of let you off with a warning. He didn't like the way they conducted business, he meaning Judge Jones. He didn't like the fact that they had held themselves out to be performance boat builders and that they could put these engines in the boat and that they could make this boat run like a race boat and make it reliable also, and they failed utterly. And so he didn't want to break the bank, he wanted to make my client whole, and he thought that was the right thing to do. He didn't want to break the company, which was Black Thunder, but he wanted to – it was like, you know, okay, next time you're going to get a real ticket if you speed this fast. It was kind of like that. But is there such a thing under state law as nominal punitive damages? I've never encountered it. I mean, I understand the general purpose of punitive damages, and we often see nominal compensatory damages of $1 in certain kinds of cases. I've just never seen a $1 punitives award. You hear about these cases in law school, but I never lived through one until now. I feel as you do, Judge, that if he was going to award punitives, he should have awarded punitives to punish them. Maybe he felt like the repair bill was punishment enough. He also reduced the repair bill for the repair of the drives, so he dropped it $10,000 for that because the original tab on all the repairs was $136,000 and change, and what I got awarded was $126,000 and change. To address the three areas of legal error that were brought up by the appellant, error number one, or what they're calling error number one, is basically a parole evidence argument that was never made at the trial level, was never included in the trial brief. To answer your earlier question, I do not think an integration provision in a contract stops you from making a fraud claim or stops the evidence of the fraud claim as an independent claim from coming before the court. That is an independent claim. It's a separate area of law. It may stop parole evidence from coming in, and I think that's what that provision was aimed at, but if they wanted to stop it and they wanted the court not to consider that at the trial court level, they needed to make that objection. That objection is not now properly before this court, and I do not think it should be considered at this time. There was independent evidence, even under the Tallman decision, to establish the fraud component through deposition testimony of Bob Jenkins, deposition testimony of Tom Rick, deposition testimony of Roger, maybe not Roger Reeves, but certainly the provisions of the contract itself, demonstrated Black Thunder's intent never to warrant the engines, even though there are salespersons out there, allaying the fears of a client and telling him, not only are these engines at trade-in time in good condition, which was wrong, not only are these engines in good condition, we're going to rebuild them with all new parts, we're going to make this engine run like a new engine. Now, this isn't a car salesman saying, I've got the best cars in town. It's not sales talk. This is a guy answering questions in Jerry Dougherty's home, where Jerry Dougherty says, listen, I want to put these engines in my 1997 boat, but I'm afraid of buying someone else's problems. Everyone understands that has been a consumer. Buy a used car, buy a used anything. Tom Rick is telling him, don't worry about it. Pay me $70,000 for these engines, which is a lot of money, and you'll get engines that are in good condition now. We'll fully rebuild them with all new parts, so all the wearable parts won't be worn. We're going to make this thing run like it's a new engine, and you'll save money. And the fourth thing that he told him, which was the clincher, which was the icing on the cake, which made the sale happen, the inducement. You'll get a full warranty from Black Thunder. That's a bumper to bumper. Whatever goes wrong, we'll make sure it goes right afterwards. The second, after those representations were made, of course everything fell downhill, and that's all in the timeline in the brief of everything that went wrong. Now, the second point that was made is you have to honor the contract provisions. The warranty says that the warranty work has to be done at the premises of Black Thunder. You can't have third parties working on it. The impression that's being given here is that Jerry Dougherty unilaterally ran off with this boat, refused to contact or even deal with Black Thunder, and that Black Thunder had no control at all as to what he did with the boat or the engines, and he ran up a huge bill, and it was out of Black Thunder's control, and that's why these provisions are in the contract. Jerry Dougherty, if you look at it from his side, Black Thunder's had two chances to get this boat right. Once Competition Marine supposedly rebuilt these engines, but didn't. They put the engines in the boat. They rigged it. They tested it. They told him it was okay. This is after he showed up in October on the 23rd, and they ran the boat on the river, and there was problems with the boat. They said, Jerry, come back tomorrow. We're going to fix everything. We'll deliver it to you then. They supposedly tuned it. They did whatever they had to do with it. There was some water pressure problems with the water going to the intercooler for the blower. He picks it up the next day. They tell him it's all right. He's on the water at Lake Mead, and within five minutes it burns a hole in the piston because it's too hot. It's a detonation problem. That means the intercooler for the blower is not working. The engine's getting too hot, and you burn a hole in the piston. They rigged it such that there was one water pickup. The water coming out of whatever cold water base they were floating in is supposed to run cold to the intercooler to cool the blower. Instead, they ran it through the bell housing. They cooled the oil for the motor, and then they ran hot water to the intercooler. Detonation problem, blown engine. It happened twice, and it was a rigging problem. That rigging is warranted in the contract. If you look at paragraph 3, it says that Black Thunder warrants their workmanship. They can disclaim whatever they want after that, but they said they would warrant their workmanship, and their workmanship is the rigging. So that alone says breach a contract, breach a warranty, to the tune of whatever it costs to fix these motors and to get this boat back on the water. The next thing was he made these repairs with third parties, but if you look at in March of 2001 after the second failure happened, Mr. Doughty writes a letter. It's in tab 54, page 118 of the record, of the appendix. It's a letter to Bob Jenkins. It's a May 2, 2001 letter, where it says, Bob, I just spent $10,000 pulling these engines out of here. You've had two shots to do this. It doesn't say this in the letter, but Jerry's thinking, you've had two shots to do this. You can't seem to get it right. I can't pay for repeated trips back to Missouri from Nevada to get this boat repaired. I am disillusioned at this point. I spent $10,000. Paul Faff has them. They're a part. He's inspected them. He hasn't done anything else. He's telling me, here's the recommendations. Buy new motors or rebuild these ones and put them back in. Call me. Let's discuss this. Also, he promises to share the information from Dunsmore Marine and Paul Faff and give it to Black Thunder and their mechanics for their findings so they can put their heads together and do something about this. That is not a guy who's running all over the landscape with a couple of motors, not bringing Black Thunder into the process, not allowing them to fulfill their obligations under a warranty. That's a guy who, number one, hasn't received a written warranty yet, doesn't know what he has. He's got a reluctant company who's not really stepping up to the plate, and he's writing them a letter saying, my mechanics had to do something about this. This is what they did. It only cost me $10,000 so far. What do you want to do? What did they do? They stuck their head in the sand. They thumbed their nose at him. If he did have a warranty, they certainly breached it then. So to say that the provisions in the contract or the warranties, whatever they were, that may have been provided, although they were far less than what were promised, were voided because he took it to a separate mechanic, I think is to ignore the facts of the case, ignore the fact that Black Thunder didn't step up and honor the warranty and be part of the process when they had a chance to do that. The third assignment of error was this fraud by omission. Now, we stated in our brief, fraud by omission was not claimed, and I don't think that's what the judge was getting at in his opinion. His opinion was, you came into this man's home and you made it sound like you could do this work. Those are representations. That's not an omission. You said you could put this boat on the water. You said you'd built high-performance boats in the past, but you put factory engines in them. Now, suddenly, you're in the 900-horsepower supercharged business. Before, it was just 500 horsepower from MerCruisers. Those were the guys that were giving the engines. MerCruisers is like the GMAC of boat engines. Of course they run. Now, Black Thunder is selling their own engines, 900 horsepower, supercharged, and they're saying, we can do this for you, Jerry. And what the court didn't like, what Judge Jones didn't like, is they couldn't do it for him. And if you look at the deposition testimony, they hadn't done it that many times before that. They were chasing their tail. They couldn't find the rear end with both hands with this kind of motor. With this kind of horsepower, they couldn't do it. They were relying on competition marine that didn't do their job right. They didn't know how to rig the boat right. If you look at Rod Carnoffel's affidavit, he shows you and lays it out that the rigging problems were elementary, and they should have been caught. And they had a chance two times to catch it, and they couldn't catch it. So it wasn't fraud by omission. It was fraud because they should have said, listen, Jerry, we'll do this for you, but we don't have much experience. That's what the judge wanted them to say. And they didn't say it. What they said was, we can do this for you. I don't know if the court has more questions. There's a lot in the brief that hasn't been argued here that establishes fraud. Judge Gold, do you have any additional questions of the appellee? No, I really don't have any. Thank you. Judge Nelson? No. We don't have any additional questions. You don't have to feel compelled to use all your time because we do read everything. Thank you very much. Thank you. May I please, Court? Let me put one thing to rest right now, and that is the argument that what counsel characterizes as the plural evidence argument wasn't made below. If you look at the excerpts of records on pages 137 to 139, the argument is addressed because this was a decision by the district court on written briefs with submission of affidavits and documents, et cetera. It's addressed in terms of the question of the validity of the integration provisions and whether they barred the claims that were being made. As a matter of fact, one of the quotes that's in there does, in fact, identify it as a parole evidence rule argument. The point here is not an evidentiary question. The point here is a legal question. And that's what is fully addressed, as I say, at pages 137, 139 of the excerpts of record, which is a section of our trial brief. Now, counsel's essential argument is that we could do what we like with this boat, regardless of what the contractual requirements were for holding Black Thunder liable, essentially because, well, Black Thunder didn't step up. And it points to the letter in the record from Mr. Daugherty with respect to what Mr. Dunsmore has done, what Mr. Paff is doing with respect to the engines. This is after they've been pulled, after they've sent to Mr. Paff, and he says, well, this is evidence that Black Thunder was put on notice and they simply didn't step up. Well, the problem is that if you take a look at the last sentence of the letter, or at least the next to the last sentence, please call me regarding this matter as soon as possible, as I need to tell Bill Dunsmore how to handle this situation. All right. Well, from an appellate standpoint, they have one way. They're putting forth one argument on the facts. You're putting forth another argument on the facts. As an appellate court, how do we go against what the district court did? You go against what the district court did because that factual dispute should be preempted by what the parties agreed to in the contract. If you want to hold Black Thunder liable, here's what you have to do. And that's the whole point of my argument here. It's not a question to have this court relitigate the facts. It is to attempt to illustrate that the facts of this case show why these provisions are important and why they should be honored by the courts. All right. Your time has expired. Thank you for your argument. This matter will now stand submitted. The Court is going to take a brief recess for approximately 10 minutes. Judge Kohl, the clerk will notify us when you come back on camera, and then we'll return. Thank you. Thank you.
judges: T.G. Nelson, Gould, Callahan